## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

_____

|  |  |  |
|---|---|---|
| VICTORY MEDIA GROUP, LLC and ACTION OUTDOOR ADVERTISING II, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | FILE NO. _____ |
| DAWSON COUNTY, GEORGIA, | ) ) | |
| Defendant. | ) ) | **JURY TRIAL DEMANDED** |

_____

## <u>COMPLAINT</u>

Plaintiffs Victory Media Group, LLC and Action Outdoor Advertising II, LLC hereby submit their Complaint against Defendant Dawson County, Georgia, showing this Honorable Court as follows:

## <u>PARTIES</u>

1.

Plaintiff Victory Media Group, LLC ("Victory") is a limited liability company that specializes in operating signs that are used by businesses, individuals, churches, charities, and public agencies to post commercial and noncommercial messages. Victory's two owners – Steve Galberaith and Beth

Perkins – have over 57 years of combined experience in the sign business.  Mr. Galberaith has operated many signs in Georgia.

2.

Plaintiff Action Outdoor Advertising II, LLC ("Action") is a limited liability company that specializes in operating signs that are used by businesses, individuals, churches, charities, and public agencies to post commercial and noncommercial messages.  Action's owner – Jack Hartrampf – has been in the sign business since 1992.  He has operated many signs in Georgia.

3.

Defendant Dawson County, Georgia ("County") is a political subdivision of the State of Georgia.  The County is a rapidly growing part of the metropolitan Atlanta region.  Georgia Highway 400 runs through the southeastern portion of the County, bringing residents and visitors to the County.

**JURIDICTION AND VENUE**

4.

Plaintiffs' claims arise under the First and Fourteenth Amendments to the United States Constitution and Section 1983 of the Civil Rights Act.  This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.  Plaintiffs' state law claims

are related in such a way to their federal law claims that this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.

Defendant is subject to the jurisdiction of this Court and venue in the Gainesville Division is proper against Defendant under the facts and circumstances as alleged herein.

## FACTUAL AND PROCEDURAL BACKGROUND

6.

The owners of Victory and Action spend significant time in Dawson County and have seen that local businesses and organizations would benefit from more signage which would engage the many motorists on Georgia Highway 400 and the bustling commercial areas adjacent to 400.

7.

They have met with several local landowners and business owners concerning the possibility of leasing their properties to erect new signs. Business owners, property owners, and County residents have been enthusiastic about the prospect of additional signage, both for advertising and for additional income. Modern billboards with LED displays are an invaluable medium for speech activity. For example, they are the best way to convey emergency messages – such

as Amber Alerts, evacuation instructions, and disaster information – to the motoring public. In Georgia, the Georgia Bureau of Investigation, Georgia Emergency Management Agency, and Georgia Department of Transportation ("GDOT") have all reached agreements to use these modern billboards and have praised the sign industry. GDOT and the federal government have completed thorough safety studies and have confirmed the safety of electronic billboards so long as they are operated in accordance with GDOT's rules.

8.

Victory and Action eventually reached agreement with several landowners who stand to earn substantial income if a sign is posted on their property. These properties are adjacent to some of the County's most heavily trafficked roadways, all adjacent to or near Georgia Highway 400. They are certainly suitable properties for the proposed signs. None of the sites are in the County's rural or residential areas. Each of these sites meets GDOT's rigorous criteria for outdoor advertising signs.

9.

On August 27, 2020, Mr. Hartrampf on behalf of Action submitted five permit applications for signs which would convey "off-premise" content.

4

10.

On August 27, 2020, Mr. Galberaith and Ms. Perkins, on behalf of Victory, also submitted five permit applications for signs which would convey "off-premise" content.

11.

On Friday, September 4, 2020, Mr. Hartrampf received an email from County employee Angela Byers collectively denying all five of Action's applications based on non-compliance with the Dawson County Sign Ordinance.

12.

That same day, Ms. Perkins received an email from County employee Angela Byers collectively denying Victory's five applications based on non-compliance with the Dawson County Sign Ordinance.

13.

Pursuant to Section 129-304 of the County's Sign Ordinance, Action timely filed an appeal for the denial of its five applications by submitting a written appeal letter and the $350 appeal fee to County Manager David Headley on September 11, 2020.  This was within the deadline to file an appeal imposed by the Ordinance.

14.

Victory also submitted a timely written appeal for its five applications and a $350 appeal fee to County Manager David Headley on September 11, 2020, pursuant to Section 129-304 of the County's Sign Ordinance.

15.

On September 8, 2020, Victory submitted two additional sign permit applications to the County for processing.

16.

On September 15, 2020, Victory received two letters via email from County employee Angela Byers denying Victory's two additional applications based on non-compliance with the Dawson County Sign Ordinance.

17.

On September 17, 2020, Victory and Action received a phone call from County employee Angela Byers requesting revised appeal letters for each location with additional appeal fees at $350 per application (a total of $4,200).

18.

In accordance with the guidance and instructions of the County staff and legal counsel, Victory and Action submitted supplemental written materials to the

County and additional support for the arguments that they intended to make at the appeal hearing.

19.

Victory and Action also requested various documents from the County via an open records request that was submitted to the County after the sign applications had been denied.

20.

On September 17, 2020, Victory submitted a timely written appeal and additional appeal fees to County Manager David Headley, pursuant to Section 129-304 of the County's Sign Ordinance, as to the latest denial letters.

21.

All of the appeals submitted by Victory and Action were scheduled to be heard by the County's Board of Commissioners ("BOC") on October 8, 2020.

22.

On October 8, 2020, the BOC held a hearing to receive evidence and argument regarding all twelve appeals.

23.

Voluminous evidence was introduced into the record by Victory, Action, and the County. Several witnesses provided live testimony. The hearing was video recorded and also transcribed by a court reporter.

24.

At the conclusion of the hearing, the BOC voted to table a vote on the appeals until the October 15, 2020 meeting.

25.

At the October 15, 2020 meeting, the BOC voted to uphold the County staff's denial of all twelve applications submitted by Victory and Action.

26.

On or about October 22, 2020, Petitioners received twelve letters from the County informing them in writing that each of their appeals had been denied by the BOC.

27.

As a result of the County's improper denial of the applications submitted by Victory and Action, Plaintiffs have been unable to post their applied-for signs. Plaintiffs have lost not only the income associated therewith, but also the ability to display desired commercial and noncommercial messages.

## **PROCEDURAL POSTURE**

### 28.

In response to the denial of their administrative appeals, Plaintiffs have filed an appeal – via a petition for writ of certiorari – in the Dawson County Superior Court.  See Victory Media Group, LLC, et al. v. Dawson County, et al., Case No. 2020-CV-0372 (filed Oct. 28, 2020).

### 29.

In addition to pursuing a state court remedy, Plaintiffs have filed this action based on the constitutional claims raised herein, pursuant to 42 U.S.C. § 1983, for compensation for the damages they have suffered as a result of the County's unconstitutional conduct and, pursuant to 42 U.S.C. § 1988, reimbursement for all reasonable costs, including attorneys' fees, of bringing this lawsuit to assert their constitutional rights.  Georgia's federal courts have awarded damages based upon the improper denial, or delay in approving, sign applications.  For example, after trial in the case of KH Outdoor, LLC v. Fulton County, a verdict and judgments totaling nearly $4,500,000 were entered.  Georgia's state courts have often done the same, based on both federal and state law.

30.

Plaintiffs have filed these separate actions because some Georgia appellate decisions indicate that the sole remedy available to seek review of a quasi-judicial decision by a local appeal board is an appeal by writ of certiorari – e.g., City of Cumming v. Flowers, 300 Ga. 820 (2017) – and that other claims cannot be pursued in a certiorari case.  E.g., Rozier v. Mayor, 310 Ga. App. 178, 180 (2011); Starnes v. Fulton County School Dist., 233 Ga. App. 182, 185 (1998).

31.

Plaintiffs put Dawson County on notice – both in writing and orally – during the administrative appeal process that they intended to pursue these constitutional claims as part of any appeal.  Therefore, they are allowed to pursue these claims before this Court.  E.g., Ashkouti v. City of Suwanee, 271 Ga. 154, 155 (1999).

32.

At the appropriate time, Plaintiffs will propose that this companion case for damages and attorneys' fees stemming from Dawson County's unconstitutional behavior should be coordinated with the appeal filed in the Superior Court of Dawson County for the purpose of judicial economy.

## **FIRST CLAIM FOR RELIEF**

## **Violation of Free Speech Rights**

33.

Plaintiffs incorporate herein by reference each of the allegations of paragraphs 1 through 32 as if they had been fully restated herein.

34.

Plaintiffs' free speech rights, as guaranteed by the First Amendment to the U.S. Constitution and Article I, Section I, ¶ 5 of the Georgia Constitution, have been violated in multiple respects:

1.   The Sign Ordinance Is an Invalid Prior Restraint.

35.

The County's Sign Ordinance is a prior restraint because it allows the government to "deny access to a forum for expression before the expression occurs." Café Erotica of Fla., Inc. v. St. Johns County, 360 F.3d 1274, 1282 (11th Cir. 2004).

36.

A prior restraint on speech carries a heavy presumption of invalidity, and is permissible under the First Amendment only if the regulations "(1) ensure[s] that

permitting decisions are made within a specified time period, and must (2) avoid 'unbridled discretion' in the hands of a government official." Id.

37.

To satisfy the time-limit requirement, an ordinance must "ensure that permitting decisions are made within a specified time period." Café Erotica, 360 F.3d at 1282; Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1271 (11th Cir. 2005).

38.

Section 129-276 of the County Sign Ordinance plainly requires the County to take action on permit applications within seven (7) days of the County's receipt of a sign application. This requirement was inserted by the County in order to comply with constitutional requirements under the state and federal constitutions.

39.

In light of the content-based nature of the Sign Ordinance, if Dawson County did not have a strict time limit on processing sign applications, then the ordinance would be unconstitutional and void. Café Erotica, 360 F.3d at 1282; Solantic, 410 F.3d at 1271.

40.

However, as evidenced by the County's behavior in this case, the seven-day deadline found in the Sign Ordinance is illusory because there are no consequences if the County misses this deadline.

41.

It is undisputed that the County failed to process the first five applications Victory submitted to the County on August 27, 2020 in compliance with the seven-day time limit.

42.

It is also undisputed that the County failed to process the first five applications Action submitted to the County on August 27, 2020 in compliance with the seven-day time limit.

43.

Rather than automatically approve the applications submitted by Victory and Action, after missing the deadline, the County proceeded to deny the applications and refuse to allow Plaintiffs to move forward with their protected speech activity.

44.

The County cannot have its cake and eat it too.  Either Victory and Action were entitled to have the permit applications they submitted on August 27, 2020

granted because the County failed to meet its own deadline – see The Lamar Company, LLC v. City of College Park, Case No. 2013cv225619 (Fulton Cnty. Super. Ct. Jan. 28, 2015) (invalidating ordinance that failed to allow applicant right to operate if time limit is not met); Tinsley Media, Inc. v. City of Woodstock, Case No. 06cv2785 (Cherokee Cnty. Super. Ct. Mar. 20, 2009) (ordering issuance of permits where city failed to meet time limits contained in ordinance) – or the County has no true time limits on the processing of sign applications, and the Sign Ordinance is unconstitutional in its entirety and the signs must be allowed because no valid restrictions are in place.  E.g., Solantic, 410 F.3d at 1271; The Lamar Co. v. City of Marietta, 538 F. Supp. 2d 1366, 1375 (N.D. Ga. 2008).

> 2.      The Sign Ordinance Is Content-Based and Fails Strict Scrutiny.

45.

In the decision of Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015), the Supreme Court held that "[g]overnment regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  Id. at 2227 (citations omitted).  The Court deemed this rule to be "commonsense" and requires a reviewing court to determine whether a law "'on its face' draws distinctions based on the message a speaker conveys."  Id.  The Court reviewed the local sign law at issue and found that categories of signs such

14

as "temporary directional signs," "political signs," and "ideological signs" were defined and regulated "entirely on the[ir] communicative content" and were thus content-based and subject to strict scrutiny.  Id.  The Court then analyzed whether the content-based law could survive strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  Id. at 2231 (citations omitted).  The Court held that the law could not survive strict scrutiny because, even if the town's interests in traffic safety and aesthetics were considered compelling governmental interests, the code was "hopelessly underinclusive."  Id. (noting that signs bearing certain messages were "no greater an eyesore" than other types of signs, as well as the lack of evidence that signs bearing some messages are more detrimental to traffic safety than signs conveying favored content).

46.

The County's ordinances and the invalid sign code at issue in Reed are materially indistinguishable.  The County's Sign Ordinance also classifies and regulates signs based on their content.  E.g., Sign Ordinance, § 129-32 (defining specific interest of the traveling public sign as "information regarding places offering lodging, food, or motor vehicle fuels and lubricants, motor vehicle service and repair facilities or any service or product available to the general public"); §

129-150(a) (exempting official signs and notices placed by County from permitting requirement); § 129-55 (drawings painted on buildings that contain copy, symbols, or other references to products or services shall be considered signs); § 129-117 (prohibiting various types of signs based on their content); § 129-150 (exempting signs from permitting requirement based on content, including official government signs and notices, flags of the United States, Georgia, or other official flag, and gasoline signs); § 129-225 (defining vehicle signs based on content); § 129-247(a) (prohibiting size variances for "off-site" signs).

47.

And while the County tries its best to obscure the fact that it differentiates between "on-site" and "off-site" signs – the fact that size and height variances are only allowed for "on-site" signs (id. at § 129-247(a)) and the largest signs are reserved for the "on-site" planned center signs (id. at § 129-233(b)) reveals the County's preference for "on-site" signs.[1]  Since Reed, courts have recognized that

---

[1] The County's Georgia 400 Development and Design Guidelines further confirm the importance of the "on-site"/"off-site" content distinction to the County.  The Georgia 400 Guidelines make it clear that planned center signs are intended to promote one monument sign for all the on-site businesses, "not individual pole signs for multiple businesses" which is a "discouraged if not prohibited practice." See generally Ga. 400 Guidelines.  Moreover, the Guidelines recommend that "off-site" signage should be limited to logo directional signs similar to the Georgia Department of Transportation's blue logo sign program.  Id. at § 117-387.  Such content preferences are no longer allowed after Reed.

this off-site/on-site distinction is content-based and unconstitutional. Thomas v. Schroer, 116 F. Supp. 3d 869, 875-76 (W.D. Tenn. 2015) (relying upon Reed to enjoin Tennessee agency from enforcing sign law that subjected off-premise signs to more regulation than on-premise signs), aff'd 937 F.3d 721 (6th Cir. 2019); Reagan Nat'l Adver., Inc. v. City of Austin, 972 F.3d 696 (5th Cir. 2020); L.D. Mgmt. Co. v. Thomas, 456 F. Supp. 3d 873, 876 (W.D. Ky. 2020) (invalidating Kentucky outdoor advertising laws based on Reed and Thomas). This has been the law in Georgia for more than 20 years. Union City Board of Zoning Appeals v. Justice Outdoor Displays, 266 Ga. 393, 394-97 (1996) (invalidating off-premise/on-premise distinction and expressly rejecting a federal decision to the contrary).

48.

In addition to the off-premises/on-premises distinction, the County's exemption for government signs (Sign Ordinance, § 129-150(a)) is also content-based and unable to survive strict scrutiny. E.g., Reed, 135 S. Ct. at 2231 (finding "speaker-based" exemptions unconstitutional); Solantic, 410 F.3d at 1257-62; Foti v. City of Menlo Park, 146 F.3d 629, 637 (9th Cir. 1998); Citizens for Free Speech, LLC v. County of Alameda, 194 F. Supp. 3d 968, 984 (N.D. Cal. 2016) (exemption for "official public signs and notices" content-based pursuant to Reed);

Bee's Auto, Inc. v. City of Clermont, 8 F. Supp. 3d 1369, 1380-81 (M.D. Fla. 2014) (exemptions content-based, citing Solantic); Sweet Sage Café, LLC v. Town of N. Redington Beach, 2017 WL 385756, *8-9 (M.D. Fla. Jan. 27, 2017) (same, citing Reed and Solantic).  The County's many other content-based provisions also cannot be justified.

49.

The Sign Ordinance's content-based restrictions also result in the County favoring commercial over noncommercial speech.  Constitutional free speech protections simply do not allow sign codes to limit the largest allowable signs to commercial content, as the County Sign Ordinance does.  Sign Ordinance, § 129-223 (limiting all large planned center signs to on-premises content and mandating inclusion of street address where planned center is located); e.g., KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1270-71 (11th Cir. 2006) (striking down provision which allowed large signs but limited them to commercial content).

3.     The Sign Ordinance Fails the Least Restrictive Means Test.

50.

Article I, Section I, Paragraph V of the Constitution of the State of Georgia provides that "no law should be passed to curtail or restrain the freedom of speech . . . ."  The Georgia Supreme Court has recognized that this provision provides even

18

broader protection of speech than the First Amendment.  E.g., Ga. Const., Art. I, §

I, ¶ V; Coffey v. Fayette County, 279 Ga. 111, 111 (2005) ("Coffey I") ("This

Court has interpreted the Georgia Constitution to provide even broader protection

than the First Amendment"); Statesboro Publ'g Co. v. City of Sylvania, 271 Ga.

92, 95 (1999) (requiring city government "to suppress no more speech than is

necessary"); State v. Miller, 260 Ga. 669, 671 (1990) ("the 1983 Constitution of

Georgia provides even broader protection" than the First Amendment).

51.

Indeed, the most important difference between Georgia and federal law in

the realm of free speech is that the Georgia Constitution requires "a government to

adopt the least restrictive means of achieving its goals."  Coffey I, 279 Ga. at 111.

As such, the government must "draw its regulations to suppress no more speech

than is necessary to achieve [its] goals."  Id. (citing Statesboro Publ'g, 271 Ga. at

95-96).  In order to prove that this high threshold has been met, the Georgia

Supreme Court requires the government to present evidence supporting its

regulations.  Coffey v. Fayette County, 280 Ga. 656 (2006) ("Coffey II").  If such

evidence were not required, courts would merely defer to a government's

unsubstantiated belief that its restrictions are the least restrictive means of

achieving its goals, and "Georgia's additional restrictions on limitations on free speech would be rendered meaningless." Id. at 657-58.

52.

Despite the foregoing requirement, the County has not introduced evidence which proves that its Sign Ordinance is the "least restrictive means" of achieving the County's legitimate interests.

4.    The Sign Ordinance Is Unduly Discretionary.

53.

Government discretion in speech permitting is allowed, if at all, only where constrained by precise and objective standards. E.g., Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992) (such a scheme "may not delegate overly broad licensing discretion to a government official"). A law that "subjects the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority is unconstitutional." Café Erotica, 360 F.3d at 1284-85. Here, the Sign Ordinance grants unlawful discretion to County officials in several obvious respects.

54.

First, the Sign Ordinance affords the County wholesale discretion to turn down any sign application at its whim. For example, the County relied upon

20

several discretionary provisions to deny Plaintiffs' applications. This discretion

plainly violates <u>Forsyth County</u> and its progeny.

55.

Second, the Code gives the County the power to request of applicants "any

other measurements as may be required by the county manager or designee." <u>Id.</u> at

§ 129-275(c). This type of "catch all" provision in speech permitting schemes has

been routinely invalidated. <u>E.g.</u>, <u>Lady J. Lingerie, Inc. v. City of Jacksonville</u>, 176

F.3d 1358, 1362 (11th Cir. 1999); <u>Miami Herald Publ'g Co. v. City of Hallandale</u>,

734 F.2d 666, 669 (11th Cir. 1984) (holding that requiring compliance with "all

applicable provisions" of the city codes vested local officials with unfettered

discretion); <u>Public Citizen, Inc. v. Pinellas County</u>, 321 F. Supp. 2d 1275, 1292-93

(M.D. Fla. 2004) (holding that an "ordinance that grants the decisionmaker

authority to request 'any additional information' confers 'unconstitutional

discretion because it presumes that the decisionmaker will use her blanket

authority to request additional information only in good faith and consistent with

implicit standards'").

56.

Third, when addressing variances, the Sign Ordinance utilizes the permissive

word "may" to provide officials discretion to license signage. Sign Ordinance, §

21

129-223(a)(2) (additional height may be permitted by County officials); § 129-247(a) ("Administrative variances may be granted by the county manager or designee). Indeed, if an applicant satisfies the listed variance criteria, but the Board of Commissioners does not like the fact that the message on the sign will be, the Ordinance provides them with the authority to deny the variance. Such discretion is clearly unlawful. Indeed, permitting schemes which utilize the word "may" have routinely been invalidated. E.g., City of Marietta, 538 F. Supp. 2d at 1372 (holding that the use of the word "may" afforded local officials total control over a sign permit, such discretion created the potential for local officials to arbitrarily suppress undesirable speech, and that this single deficiency caused the entire code to be invalid); Lamar Adver. Co. v. City of Douglasville, 254 F. Supp. 2d 1321, 1328 (N.D. Ga. 2003) (invalidating provision which authorized official to grant sign permit if all criteria were met but did not require the official to grant the permit).

57.

Fourth, the Sign Ordinance authorizes County officials to approve or reject variances based on criteria such as whether the variance "create[s] a safety hazard or other condition inconsistent with the general purpose of this chapter." Sign Ordinance, § 129-247(e). These are wholly subjective determinations that are in

the eye of beholder. While such criteria are fine in the context of most development variances, they simply do not fly in the realm of signs. <u>Nittany Outdoor Advertising, LLC v. College Township</u>, 22 F. Supp. 3d 392, 416 (M.D. Pa. 2014) (finding extremely similar sign variance criteria to be subjective and unconstitutional).

58.

Based upon these and other bases, the County Sign Ordinance is unconstitutional and the Court should declare it invalid. Because the Sign Ordinance is constitutionally deficient, it is a nullity and an invalid basis upon which to deny Plaintiffs' proposed signs. As a result, the County should be ordered to allow the applied-for signs to be posted.

5.    <u>The Sign Appeal Fee Is Unconstitutional.</u>

59.

The County's appeal mechanism is unconstitutional because the sign appeal fees totaling $4,200.00 between Action and Victory ($350 per sign, even though there were essentially only two appeals) are not tied to Dawson County's actual costs.

60.

The exorbitant sign appeal fees have the result of chilling constitutionally protected speech.  For example, someone who was denied a permit for a sign for a church bake sale is unlikely to pay the $350 required by the County to appeal such a denial.  The same can be said for an infinite number of possible signs, most of which are not allowed in the County by right, are likely to be denied, and then certainly cannot be appealed due to the appeal cost far exceeding any reasonable amount.

61.

As the Supreme Court established in Cox v. New Hampshire, 312 U.S. 569 (1941), and Murdock v. Pennsylvania, 319 U.S. 105 (1943), government may charge a fee for speech activity but that fee may be no more than the amount needed to cover administrative costs.

62.

It is well established that government may not profit from the imposition of fees on the exercise of First Amendment rights.  Cox, 312 U.S. at 577; Murdock, 319 U.S. at 113-14.  Courts have reaffirmed this rule of law repeatedly.  E.g., Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1313 (11th Cir. 2003); Sentinel Communications Co. v. Watts, 936 F.2d 1189, 1205 (11th Cir. 1991).  In Fly Fish,

the Eleventh Circuit noted that when First Amendment freedoms are made subject to a licensing scheme, only revenue-neutral fees may be imposed.  In addition, it is the government's burden to demonstrate that its fee is reasonably related to recoupment of its costs.  337 F.3d at 1314.

63.

By imposing a $350 sign appeal fee per application, Dawson County is simply profiting from the exercise of speech rights.  Sign applicants whose permits are delayed or denied generally do not appeal based on the fees.  The sign appeal fees imposed by the County are unconstitutional and must be invalidated.

6.   Delays Based on Invalid Ordinances and Zoning Map.

64.

As set out in great detail in Plaintiffs' state court proceeding, the County codes upon which the County relied in denying Plaintiffs' sign application were manifestly invalid and void ab initio based on violations of Georgia's Zoning Procedures Law.  Delay in the approval of Plaintiffs' signs has delayed speech activity and gives rise to claims for damage pursuant to 42 U.S.C. § 1983 and reimbursement of legal fees and expenses pursuant to 42 U.S.C. § 1988.

65.

Based on at least these six grounds, pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to compensation for the damages they have suffered as a result of the County's unconstitutional conduct and, pursuant to 42 U.S.C. § 1988, reimbursement for all reasonable costs, including attorneys' fees, of bringing this lawsuit to assert their constitutional rights.

WHEREFORE, Plaintiffs Victory Media Group, LLC and Action Outdoor Advertising II, LLC demand judgment against Defendant Dawson County, Georgia:

(1)    compelling Defendant to permit the applied-for signs and provide any and all necessary certification to the State of Georgia;

(2)    awarding damages pursuant to 42 U.S.C. § 1983 or Georgia law including actual, consequential, general, and/or nominal damages resulting from the County's unconstitutional conduct;

(3)    ordering reimbursement pursuant to 42 U.S.C. § 1988 for legal fees and expenses;

(4)    a trial by jury on any issue that should not be resolved by the Court as a matter of law; and

(5)    such other and further relief as the Court may deem just and equitable.

DATED this 30th day of October, 2020.

Respectfully submitted,

BY:     WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb
  Georgia Bar No. 743910
G. Franklin Lemond, Jr.
  Georgia Bar No. 141315

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-9325
(770) 444-0271 (fax)

*Attorneys for Plaintiffs*